Gregory G. Paul, SBN 233060
Paul Law Offices
1808 Wedemeyer Street, Suite 216
San Francisco, CA 94129
Tel: (844)374-7200
Fax: (888) 822-9421
gregpaul@paullaw.com

Attorney for Plaintiff

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

GRACE BRIGGS,

        Plaintiff,

  vs.                                Civil Action Number:

JUUL LABS, INC.,

        Defendant.

## **COMPLAINT**

    AND NOW, comes the Plaintiff, Grace Briggs, by and through her undersigned counsel, and files the within Complaint for violations of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000(e) et seq. ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"), the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. ("ADEA"), the Family and Medical Leave Act, 29 U.S.C. § 2611, et seq. ("FMLA"), the California Fair Employment Housing Act ("FEHA") , Cal. Gov't Code 12940(a) et seq., the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), the California Labor Code Section 1102.5, et seq. (the "Whistleblower Law"), the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §1001, et seq. ("ERISA"), the California Labor Code § 204 ("CLC"), the California Labor Code § 204 and common law.

**NATURE OF ACTION**

1. This is a proceeding to remedy discrimination, harassment and retaliation, seeking declaratory and injunctive relief and for damages against Defendant to redress the deprivation of rights secured to the Plaintiff by Title VII, the ADA, the ADEA, the FMLA, the California FEHA, Section 1981 and the Whistleblower Law.  Plaintiff, Grace Briggs, seeks a declaratory judgment and injunctive relief to restrain Defendant from maintaining practices, policies, customs, and usages, which discriminate against Plaintiff because of her race, age, disability or perceived disability, and/or in retaliation for making complaints of discrimination and harassment.  Mrs. Briggs was subjected to egregious discrimination and harassment, including being detained along with another African American employee by armed guards at the Juul workplace for an extended period against their will.  After complaining about this and other discriminatory and harassing acts, after taking medical leave pursuant to the FMLA, and after repeatedly complaining about and objecting to illegal activity occurring at Juul, including improper safeguards and procedures to monitor the levels of nicotine in Juul's products resulting in levels of nicotine in the product that was not as indicated on the packaging, contamination of the products, and improper marketing to minors, Mrs. Briggs was terminated as a result of retaliation by Juul.  Juul also breached its fiduciary duties to Mrs. Briggs as a plan participant and interfered with her ERISA rights in violation of ERISA.  Mrs. Briggs also brings claims for breach of contract and/or breach of the duty of good faith and fair dealing with respect to contractual commitments made to Mrs. Briggs regarding equity and bonus payments promised to her.

**JURISDICTION AND VENUE**

2. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343 (4), Title VII, Section 1981, the ADA, the ADEA, the FMLA, ERISA and principles of

pendent jurisdiction. Jurisdiction to grant injunctive and declaratory equitable relief as well as damages is invoked pursuant to 42 U.S.C. § 2000e-5(f) and (g).

3. Plaintiff, Grace Briggs, has exhausted the administrative remedies as evidenced by both the United States Equal Employment Opportunity Commission's and the California Department of Fair Employment and Housing Commission's Dismissal and Notice of Right to Sue.

4. This action has been filed within ninety (90) days of Plaintiff's receipt of the Notice of Right to Sue from the Equal Employment Opportunity Commission.

5. Venue lies within this judicial district, since the substantial actions complained of herein occurred within the Northern District of California.

## PARTIES

6. Plaintiff Grace Briggs is a fifty-one (51) year-old, African American citizen and resident of Smithfield, North Carolina and the United States of America.

7. Mrs. Briggs is a qualified individual with a disability within the meaning of the ADA.

8. Mrs. Briggs suffers from medical conditions, including Post-Traumatic Stress Disorder ("PTSD") as a result of the conduct she experienced at the hands of Defendant described in greater detail herein, and from traumatic brain injury she suffered outside of the workplace during the time she was employed by Defendant.

9. Mrs. Briggs' PTSD and traumatic brain injury affect major bodily functions and substantially limit one or more major life activities.

10. Mrs. Briggs has had these disabilities for a period far in excess of six months.

11. During her employment, Defendant regarded Mrs. Briggs as disabled.

12. Defendant Juul Labs, Inc. ("Juul" or "Defendant") is a Delaware corporation with its corporate headquarters at 560 20th Street, San Francisco, California 94107, where the employment decisions affecting Mrs. Briggs were made.

3

13. At all relevant times, Juul is and has been an employer employing more than 500 employees.

14. At all relevant times, employees of Defendant acted as agents and servants for Defendant.

15. At all relevant times, employees of Defendant were acting within the scope of their authority and in the course of employment under the direct control of Defendant.

16. At all times material hereto, Defendant acted by and through its authorized agents, servants, workmen and/or employees acting within the course and scope of their employment with Defendant and in furtherance of Defendant's business.

17. At all relevant times hereto, Plaintiff Grace Briggs was an "employee" of Defendant within the meanings of the laws at issue in this suit and is accordingly entitled to the protection of said laws.

18. At all relevant times hereto, Defendant was an "employer" and/or "person" under the laws at issue in this matter and is accordingly subject to the provisions of said laws.

19. At all times relevant to this matter, Mrs. Briggs was a "participant" in the company's Health and Benefits Plan (the "Plan"), as the term "participant" is defined in ERISA Section 3(7), 29 U.S.C. §1002(7).

20. At times relevant to this matter, Mrs. Briggs was a "participant" in the Company's 2016 Equity Incentive Plan (the "Equity Incentive Plan"), as the term "participant" is defined in ERISA Section 3(7), 29 U.S.C. §1002(7).

21. At all relevant times, Defendant is and has been an "employer" within the meaning of 29 U.S.C. §1002(5), a "plan sponsor" as defined in Section 3(16)(B) of ERISA, 29 U.S.C. §1002(16)(B), a "plan administrator" as defined in Section 3(16)(A) of ERISA, 29 U.S.C. §1002(16)(A), and a fiduciary within the meaning of Section 3(21)(A) of

ERISA, 29 U.S.C. §1002(21)(A).

22. The Equity Incentive Plan is an employee benefit plan as defined in Section 3(3) of ERISA, 29 U.S.C. §1002(3).

## SUMMARY OF ACTION

23. On September 20, 2017, Mrs. Briggs received an offer of employment from Juul for a position as a Senior Quality Engineer, with an expected first day of employment of September 27, 2017.

24. During her employment with Juul, Mrs. Briggs excelled in her position and performed her duties in an excellent and dedicated manner.

25. Despite her loyalty and exemplary performance, Mrs. Briggs was subjected to discrimination and extreme harassment on the basis of her race, disability or perceived disability, and age, was retaliated against for her complaints about discrimination and harassment, and was retaliated against for complaining about and refusing to engage in unsafe and what she believed to illegal practices at Juul, culminating in her being placed on administrative leave on November 13, 2019 and terminated on January 17, 2020.

26. The harassment Mrs. Briggs was subjected to included Mrs. Briggs and another African American colleague being detained by armed guards at a work site for an extended period.

27. Mrs. Briggs is highly skilled and experienced in the fields of microbiology and quality analysis.

28. She is well known in the industry and considered an expert in her fields.

29. Among other things, to induce Mrs. Briggs to work for Defendant, Juul promised her that she would become a "millionaire" from her employment with Juul.

30. Juul specifically sought out Mrs. Briggs due to her expertise, as Juul was experiencing internal quality issues.

31. In addition, due to Juul's numerous outstanding quality issues, and due to Mrs. Briggs' expertise and management experience, Juul hired a contractor, Charles McIver, to report to Mrs. Briggs and assist her in the internal quality analysis.

32. Like Mrs. Briggs, Mr. McIver is also African American.

33. Per the terms of her Employment Agreement with Juul (the "Employment Agreement"), Mrs. Briggs began her employment with Juul on September 27, 2017.

34. Pursuant to the terms of her Employment Agreement, Mrs. Briggs was promised, among other things, a base salary, an annual bonus of up to 10% of her base salary, and stock options for 12,000 shares of Juul stock vesting over a four-year period.  Ms. Briggs' Employment Agreement is governed by California law.

35. In late 2018, in connection with Altria's investment in Juul, Mrs. Briggs' equity award was increased to a total of 16,591 options.  Mrs. Briggs was also promised a cash bonus equivalent to four times her target bonus, payable over two years.  Collectively, this agreement is referred to as the "Altria Award".

36. Although Juul is headquartered in San Francisco, California and Mrs. Briggs reported to the San Francisco office, Mrs. Briggs performed some of her work on-site at a Juul liaison in North Carolina (AFG) that manufactured supplies for the Juul labs while she was employed by Juul.

37. Throughout her employment, Mrs. Briggs was subjected to discrimination and harassment on the basis of her race.

38. For example, Mrs. Briggs was constantly questioned about her employment status due to her race by White employees of the North Carolina site.

39. It became increasingly clear to Mrs. Briggs that, because she was African American, the White employees at the on-site facility did not believe that she worked for Juul, and did not respect her or accept that she was in a high-level supervisory position.

40. Virtually every day, White employees questioned whether Mrs. Briggs worked for Juul, causing Mrs. Briggs to have to constantly reaffirm her employment.

41. Mrs. Briggs faced open hostility and a disrespectful attitude from other White employees while at work.

42. Mr. McIver experienced similar inquiries and disrespect from White employees at the site.

43. Mrs. Briggs observed that Juul products were often contaminated or not in compliance.

44. As a result, she sought to ensure that such products were not shipped.  She also had concerns regarding the placement and safety of eLiquid shipments.

45. When Mrs. Briggs voiced her concerns to the facility, and directed that her concerns with the products be addressed prior to shipment, she experienced significant backlash.

46. Indeed, White employees became angry and cursed at Mrs. Briggs and Mr. McIver, as they did not believe that Mrs. Briggs and Mr. McIver should be making such demands or instructions to them.

47. Other White Juul employees at the site were not subjected to similar treatment.

48. Notwithstanding the foregoing, Mrs. Briggs continued to carry out her duties in a professional and dedicated manner.

49. These acts of discrimination and harassment continued unabated and, in April 2018, Mrs. Briggs was subjected to a particularly egregious act of discrimination and harassment at the plant.

50. More specifically, in or about mid-April 2018, Mrs. Briggs received direction from the California office regarding a specific quality check assignment in the main facility, as Juul was experiencing issues with the product's acceptable quality limits ("AQL") and/or the tests for such products were not being performed properly.

51. Mrs. Briggs contacted the facility beforehand to inform them that she and Mr. McIver would be arriving to conduct the quality inspection check assigned to them by Juul.

52. Upon their arrival at the facility, and after displaying their facility approved access badges, Mrs. Briggs spoke with the employee who was to assist them, Christopher Jones.

53. Mr. Jones informed them that he had to run some protocols but that Mrs. Briggs and Mr. McIver should proceed to the line and conduct their inspection without him.

54. Per Mr. Jones' direction, Mrs. Briggs and Mr. McIver proceeded to the line and waited for the facility employees to bring out the AQL of the product.

55. Mrs. Briggs observed several White male colleagues throughout the facility at the time.

56. Shortly after Mrs. Briggs and Mr. McIver arrived, they were approached by a White female facility supervisor/specialist, Marie Robinson, who, despite knowing that Mrs. Briggs was authorized to work at the site, asked them, "what are you doing here?"

57. Mrs. Briggs explained that they were there to perform the AQL inspection, and that Mr. Jones had instructed them to come to the line.

58. Ms. Robinson informed Mrs. Briggs and Mr. McIver that they needed to leave immediately despite the fact that Mrs. Briggs and Mr. McIver had been on-site for several months, had not had any prior issues, and they had been specifically told by Mr. Jones and Juul to conduct this inspection.

59. While numerous employees performed tasks on the line and several of Mrs. Briggs' White colleagues freely walked around the facility, two uniformed officers with firearms approached Mrs. Briggs and Mr. McIver.

60. The officers demanded that Mrs. Briggs and Mr. McIver explain what they were doing there.

61. All of the workers on the line stopped and looked at the scene taking place. Mrs. Briggs was extremely fearful and anxious, as the officers were armed and she did not know what had been told to them.

62. The officers then escorted Mrs. Briggs and Mr. McIver back to the front of the building along with Ms. Robinson.

63. Mr. Jones saw them, asked what was going on, and told them to go back.

64. The facility supervisor/specialist stated that she was going to get Regulatory Manager Rob Morehead and that Mrs. Briggs and Mr. McIver should not be there.

65. Still extremely fearful given the fact that they were being treated like criminal trespassers and escorted by armed security guards, Mrs. Briggs requested that Mr. Jones escort them to her office.

66. Mr. Jones then took them to his office in the front of the building.

67. The officers, at Ms. Robinson's urging, refused to let Mrs. Briggs and Mr. McIver leave and held them in the office for an extended period of time.

68. Ms. Robinson continued to insist that Mrs. Briggs and Mr. McIver were not supposed to be there.

69. Mrs. Briggs and Mr. McIver continued to wait, too fearful to move or take any action.

70. Notably, no one attempted to contact anyone from Juul, including Human Resources or the plant manager, to resolve the situation and/or confirm that Mrs. Briggs and Mr. McIver were exactly where they were supposed to have been.

71. Finally, after an extended period without any assistance or intervention, Mrs. Briggs and Mr. McIver were permitted to leave.

72. Mrs. Briggs was shaking violently from the incident and immediately emailed Joanna Engelke, Chief Quality Officer for Juul, to report the egregious harassment and discrimination she had experienced.

73. Mrs. Briggs stated that, in her over twenty years as a professional, she had never before been treated in such a belittling, discriminatory and humiliating manner.

74. When Ms. Engelke called her to discuss the incident, Mrs. Briggs reiterated this information, and complained that Juul had permitted the harassment, disrespect and discrimination to occur when Mrs. Briggs had simply sought to do her job as instructed and sought to prevent cross contamination of the product.

75. After speaking with management, legal and Human Resources at Juul regarding the discrimination and harassment, Mrs. Briggs was directed to begin working from home while her claims were investigated.

76. Mrs. Briggs was later informed by Vincent Lim in Human Resources that the investigation confirmed discrimination and harassment had occurred, but nothing was ever done to address the situation.

77. As a result of this incident, during which Mrs. Briggs and Mr. McIver were treated like criminals and held against their will by armed security personnel, Mrs. Briggs suffered from Post-Traumatic Stress Disorder ("PTSD") and began treating for the trauma she experienced.

78. She remains in counseling and on medication for PTSD.

79. Thereafter, the harassment and discrimination continued.

80. Several White employees at Juul outright refused to listen to Mrs. Briggs' instructions or recommendations and/or engaged in open hostility toward Mrs. Briggs based on her race.

81. Mrs. Briggs was further harassed, retaliated against and targeted by Juul after she raised issues regarding discrimination and harassment.

82. Mrs. Briggs was also retaliated against for voicing her significant concerns about the safety of Juul's products and the workplace, and Juul's inappropriate advertising and other practices intended to target minors.

83. Immediately upon beginning her employment with Juul and touring the facilities, Mrs. Briggs was shocked to discover that the nicotine (e-liquid) was not controlled, properly inspected, finished or monitored, as it was an Active Pharmaceutical Ingredient ("API")/chemical, large amounts of which could potentially be hazardous.

84. Mrs. Briggs started by meeting with AFG manager Celeste Zippetell, who shared Mrs. Briggs' concerns about the lack of direct quality expectation from Juul.

85. When Mrs. Briggs asked Ms. Zippetell about the quality agreement, Ms. Zippetell informed her that she was not aware of any such quality agreement.

86. Mrs. Briggs was very concerned and disturbed to hear that, as it was standard industry practice for such agreements to be reached and signed by the parties prior to

manufacturing in order to establish accountability, responsibility, standards, acceptability and/or non-conformity standards for products.

87. Moreover, on her first day of employment, a cut incident involving blood was identified by the supervisor on the second shift.

88. Mrs. Briggs communicated the incident to Adam deSouza, Director of Quality & Manufacturing Engineering, who directed Mrs. Briggs to investigate the incident.

89. During her investigation, it became obvious to Mrs. Briggs that the site had an issue with blood borne pathogens and Mrs. Briggs sent the incident report to key stakeholders at the Company's headquarters in California.

90. In fact, that facility had nearly daily an incident involving blood and related blood borne pathogens and cross contamination issues.

91. After learning of each occurrence, Mrs. Briggs would alert Mr. deSouza and contact Juul headquarters in California.

92. Mr. deSouza continued to instruct Mrs. Briggs to investigate with onsite Quality Assurance ("QA") for the root cause of the issue.

93. Mrs. Briggs observed that the facility management lacked training on safety and biohazard spill clean ups, and accordingly, Mrs. Briggs informed Mr. deSouza and others on potential next steps and continuously suggested safety improvements.

94. Mrs. Briggs also worked with the AFG safety team to ensure proper cleaning measures were taken when she was on site, and suggested that they obtain an experienced Environmental, Health and Safety Representative due to the numerous violations of regulations established by the Occupational Safety and Health Administration ("OSHA") and the Environmental Protection Agency ("EPA"), particularly since Mrs. Briggs was not onsite every day.

95. Throughout her employment with Juul, Mrs. Briggs addressed numerous blood incidents and biohazard spills.

96. When she was onsite for such incidents, Mrs. Briggs ensured that the employees were aware of the issue and that triple cleaning was performed.

97. Mrs. Briggs further noted that, at times, the lines started running again without proof or documentation that the blood had been properly cleaned or the quarantined product had been properly disposed of.

98. Among other individuals, Marie Robinson, QA Supervisor, insisted that the lines did not need to stop running during cleaning and/or that cleaning was not needed at all.

99. Mrs. Briggs continued to express her serious safety concerns for biohazard spills, elimination of blood contamination, and the importance of training.

100.     Mrs. Briggs was also very concerned about the quality of the product with respect to potential contamination with blood, mixed lots, mislabeled products of different flavors presenting potential allergy issues, and other issues.

101.     Mrs. Briggs recommended various solutions for these issues including, but not limited to, the use of double gloves with puncture resistance to eliminate the likelihood of cuts and cross contamination.

102.     Mrs. Briggs also learned that the AFG QA did not inform the safety personnel of blood incidents, which increased her concerns that blood was not being cleaned up properly and safely in accordance with law, regulations and industry standards.

103.     In October 2017, Mrs. Briggs also discovered that Defendant was improperly disposing of nicotine waste, as the manufactured lots ended in production and nicotine was returned to hazardous waste cage and/or poured into a non-functioning drain against nicotine waste guidelines.

104.     Mrs. Briggs knew that this would result in significant fines for the supplier.

105.     Mrs. Briggs also discovered that the disposal process for nicotine waste was not being followed, and immediately contacted Juul to inform it of this new compliance issue.

106.     Mrs. Briggs explained to the AFG production managers that waste handling and removal was not being done properly.

107.     Mrs. Briggs suggested training for current employees and suggested that Juul obtain an outside company to properly handle and dispose of the waste.

108.     Mrs. Briggs sought to obtain reports and/or documents containing the reported information of waste and/or waste disposal, but the documents provided were blank and/or incomplete.

109.     Compliance costs time and money and Juul resisted at every turn when Mrs. Briggs brought new violations to light.

110.     Mrs. Briggs continued to identify a staggering number of high-risk incidents and unsafe and illegal practices, including potentially mixed lots, cross contamination, and blood borne pathogens at the AFG facility.

111.     Throughout her employment, the safety and quality of the product continued to be at risk.

112.     Among other things, Mrs. Briggs observed mixed pallets, mixed lots, mislabeled products, complaints about empty pods and other issues, contamination, wrong barcodes, and blood in the warehouse and on the product.

113.     Numerous incidents of mixed lots were being discovered, as well as verification of contamination and blood incidents.

114.    Mrs. Briggs also had concerns about the lack of pest control, as she observed flies coming through the doors of the facilities.

115.    She later learned that a fly had even been discovered in a pod.

116.    Despite working late hours every night, Mrs. Briggs was unable to keep up with the myriad of health and safety violations.

117.    Mrs. Briggs requested more quality support on site.

118.    Although hesitant to hire additional support, Juul eventually retained one single consultant, Charles McIver, to assist Mrs. Briggs.

119.    Upon beginning at the facility, Mr. McIver also observed and voiced his significant concerns for the blatant safety violations taking place including, without limitation, that adulterated products were being staged for shipment.  Mr. McIver was deeply concerned for his job and felt that his employment was being threatened as he was being pressured to release adulterated products.  Mrs. Briggs communicated Mr. McIver's concerns to Vincent Lim in Human Resources.

120.    Outsiders who visited the site also voiced concerns regarding the numerous quality issues apparent in the facility to Mrs. Briggs.

121.    Mrs. Briggs also noted serious safety issues at other supplier facilities.

122.    For example, upon touring another local supplier, Mrs. Briggs witnessed employees during production in the break room with no segregation or supervision.

123.    Mrs. Briggs observed several insects flying around the room, e-liquid stored in a closet (which she immediately questioned the stability of), and an employee eating on the line.

124.     Mrs. Briggs reported these violations to Juul management and was informed that the supplier would be shut down temporarily to initiate a plan for remediation of the issues.

125.     Mrs. Briggs shared high risk concerns identified, and unforeseen potential gaps to all stakeholders between facilities to attempt to support effective control.

126.     Mrs. Briggs continued to make Ms. Zippetell aware of the problems she identified and documented.

127.     Mrs. Briggs also attempted to report these issues to Marie Robinson, QA Supervisor, but Ms. Robinson was not interested in hearing about any issues or suggestions for improvement.

128.     Instead, Ms. Robinson would simply smirk at Mrs. Briggs and tell her to "handle it."

129.     Due to the numerous safety hazards and violations she had observed, Mrs. Briggs made repeated efforts to improve the practices at Juul and to comply with the law, regulations and OSHA requirements including, but not limited to:

    a.   implementing awareness and oversight in manufacturing;

    b.   repeatedly expressing the need for training on incidents;

    c.   supporting triple cleanings;

    d.   repeatedly expressing the need for training and awareness with respect to Personal Protective Equipment ("PPE");

    e.   providing videos of cleaning techniques and lists of appropriate supplies and commodities in the industry;

    f.   performing and supporting investigations;

g.  recommending immediate action of double gloves, gowning, visual aids and weekly internal meetings;

h.  suggesting walks and routine production walk-through line inspections and audits;

i.  identifying quality initiatives on processes and effective controls;

j.  proposing the prioritization of equipment audits, inspections and checklists per risk;

k.  reviewing all work environments for safety;

l.  supporting AFG QA with answers to questions;

m.  performing monitoring of production to eliminate mixed lots, cross contamination and defects;

n.  making quality and production improvements;

o.  providing slides and safety data sheets for training;

p.  supporting the creation of Standard Operating Procedures, identifying root causes, and implementing stop gaps; and

q.  otherwise supporting all safety measures, such as CAPA, investigation, training, equipment process improvement, cGMP procedures, gowning and cleaning procedures, biohazard spills and cleaning, non-conformance, staging, SCARs, clean room control, air quality, and awareness of acceptable finished products.

130.    Mrs. Briggs informed Juul management and QA that if Juul was going to allow blood as part of the process, then it needed to offer a series of hepatitis shots to all employees and new hires.

131.     Mrs. Briggs also noted that all employees should be notified of the blood issues and receive training regarding such issues.

132.     Mrs. Briggs expressed her significant concern of all blood incidents and noted that they must be reported and dealt with in a timely manner to eliminate risk and cross contamination.

133.     When the Juul products were contaminated or not in compliance (which they often were), Mrs. Briggs sought to ensure that such products were not shipped, again driving down saleable production and costing money and time.

134.     Mrs. Briggs also observed and communicated her significant concerns regarding the e-liquid.

135.     Mrs. Briggs noted that Juul was not requiring stability studies or adhering to proper disposal procedures for the nicotine product, allowed the e-liquid to be transported in all temperatures, and did not test the e-liquid containers for potency or contamination during inspections or prior to being released to production.

136.     Moreover, the e-liquid has specific storage requirements, but Juul refused to adhere to such requirements or accept the specifications.

137.     Mrs. Briggs also observed faulty labels and potentially inaccurate percentages of nicotine, as Defendant improperly refused to test for potency.

138.     This caused Mrs. Briggs serious concerns that customers could receive an adulterated product and/or unintentionally overdose on nicotine.

139.     Mrs. Briggs continued to have grave concerns about the e-liquid throughout her employment, as there were noticeable color variations and the product was not being tested before being released to the production line.

140.     Mrs. Briggs had significant concerns about color variation in the e-liquid, because that could indicate that the e-liquid was contaminated, which could result in bacteria in the product or other pathogen issues.

141.     Ironically, Mrs. Briggs initially received significant praise and recognition for her excellent work performance by several of her superiors at Juul, including Brad Ferkol, Juul Vice President, and Sonia Kastner, Senior Vice President, Global Supply Chain.

142.     In fact, Mrs. Briggs was contacted to review and monitor defects relating to Juul's production in China, and was asked to participate in a high-profile meeting with Juul upper management regarding FDA expectations of a regulated environment.

143.     Mrs. Briggs was requested by upper management, as the key Quality Assurance Liaison, along with Joanna Engelke, to participate and drive key elements of special projects (for example Kong), support outlined business strategy and execution plan for starting up new clean room production and expanding with large-scale pharmaceutical manufacturing and distribution companies to increase output.

144.     The success of these projects, and in particular the Kong project, resulted in millions of dollars of bonuses being distributed to Juul employees who had been involved in the projects including, among others, liaison managers Gwilherm Lebigot and David Munoz.

145.     Further demonstrating Juul's discriminatory and retaliatory animus, Mrs. Briggs was not included among the employees who received large, six and seven figure bonuses.

146.     Despite her excellent performance and accolades, Mrs. Briggs was repeatedly at odds with certain members of Juul management who resisted her efforts to maintain and improve the safety and quality of the Juul product.

147.     For example, Mrs. Briggs had significant concerns about the e-liquid when she heard that there were black particles in the containers.

148.     However, Ms. Robinson prevented Mrs. Briggs from checking or analyzing the e-liquid or containers.

149.     Mrs. Briggs informed Mr. Ferkol and Mr. deSouza of Ms. Robinson's behavior and her concerns, and explained that if a non-conforming product was moved it would potentially return to the line and be sent out in production.

150.     In addition, Mrs. Briggs shared all her concerns of unsafe and illegal practices to Mr. Ferkol throughout her employment.

151.     In response, Mr. Ferkol repeatedly informed Mrs. Briggs that there was "a lot of work to do" and simply ignored Mrs. Briggs' expressed concerns.

152.     Notably, despite her continuous voiced concerns to Mr. Ferkol, Mr. Ferkol would repeat that there was too much to get done and would change the subject.

153.     It was clear to Mrs. Briggs that Mr. Ferkol was only concerned with output and wanted production to increase at any cost.

154.     Despite her arduous efforts to ensure quality and safety of the Juul products, and her repeated complaints about glaring safety issues, Mrs. Briggs was met with hostility, opposition and resistance.

155.     Notably, Ms. Robinson refused to support training, quality control, inspections, trending of data, issues with pod debris or empty pods, lot changes, and would not

quarantine contaminated products in a timely manner with proper identification and traceability.

156.     She also failed to support the review to open SCARs and NCRs meeting and resolutions to eliminate risk or maintain control.

157.     When Mrs. Briggs would identify and/or investigate issues, Ms. Robinson did not respond to Mrs. Briggs' emails or communicate in a timely manner.

158.     In fact, on one occasion, after blowing cigarette smoke in Mrs. Briggs' face in a non-designated smoking area, Ms. Robinson told Mrs. Briggs to "lighten up" since Juul did not have a quality agreement.

159.     On another occasion, upon requesting samples based on a request from a Juul engineer, Ms. Robinson refused to assist and told Mrs. Briggs to "do your own damn work."

160.     In addition, AFG Management was displeased with the manufacturing lines being shut down for proper biohazard spill clean-up of blood or nicotine.

161.     Mrs. Briggs was repeatedly questioned as to why Juul was performing a triple clean of the line.

162.     Mrs. Briggs responded that blood contamination is a tremendous safety risk, and Juul needed to contain that risk and prevent cross contamination.

163.     Mrs. Briggs abruptly stopped receiving the significant praise and accolades once Juul determined that her safety and quality efforts would slow down production. Many Juul employees began receiving pressure about increasing line productivity and were told not to focus on quality issues.

164.     Despite several customer complaints, mixed lots and occurrence of blood incidents, Juul ignored Mrs. Briggs' concerns because her safety and quality efforts would slow down production.

165.     Mrs. Briggs attempted to explain that if Juul was only consistent with its quality efforts, then productivity would increase.

166.     Mr. Ferkol responded that Juul was not regulated or obligated to follow FDA guidelines.

167.     Mrs. Briggs reminded him of industry standards and the serious risks to public health.

168.     Mrs. Briggs was often ignored or treated in a hostile manner due to her complaints about safety violations.

169.     In December 2018 or January 2019, Mrs. Briggs expressed her concerns about testing the product and compliance with newly hired QA Manager, Keri Calero.

170.     Ms. Calero indicated that she only wanted to push production numbers and would not address any safety or quality issues, particularly where Juul did not have a signed supplier quality agreement.

171.     Ms. Calero and Ms. Robinson would openly walk out of meetings when they did not like information or facts regarding non-conformance issues.

172.     Notably, a temporary AFG QA director identified concerns similar to Mrs. Briggs', but was immediately terminated once he began to make his staff comply with industry standards.

173.     Similarly, Marcus Gesner, Vice President of Supply Chain Quality, solely sought the increase of production with little to no concern about blood incidents, contaminated product, and mixed lots.

174.     Mr. Gesner and Mr. deSouza indicated that they took issue with Mrs. Briggs enforcing a triple cleaning after a blood incident.

175.     In addition, Mr. Ferkol asked Mrs. Briggs why Juul was conducting a triple cleaning, rather than just a single cleaning, after a blood incident.

176.     Whenever Mrs. Briggs attempted to report a quality or safety concern, Mrs. Briggs received significant backlash from multiple people at Juul, including Ms. Calero and Ms. Robinson, among others.

177.     Mrs. Briggs was told that she was not to work with or communicate with these other employees.

178.     Ultimately, Mrs. Briggs realized that the Juul culture favored those that opposed rigorous safety and quality inspections and reviews in order to increase production, and disfavored those who voiced their concerns about quality issues.

179.     Mrs. Briggs observed that individuals who raised concerns about safety issues were verbally abused, ignored, retaliated against and/or terminated for their adherence to safety rules and regulations.

180.     Mrs. Briggs repeatedly complained about cross contamination of the Juul product, including contamination with, among other things, bacteria, blood and flies.

181.     Mrs. Briggs suggested and sought to implement several measures designed to limit, prevent and/or eliminate such contamination.

182.     Virtually all of her recommendations were ignored or met with open anger, hostility and annoyance.

183.     When federal authorities such as representatives from OSHA arrived to inspect the plant, all traces of blood were hidden and undisclosed and Mrs. Briggs was instructed not to inform the authorities of her concerns.

184.     Much of the contaminated product was permitted to ship out, against Mrs. Briggs' instructions, to maximize Juul's profits.

185.     Mrs. Briggs also observed unethical and illegal practices regarding the use of signatures of previous employees.

186.     As the current Manager of Quality Assurance, Ms. Calero was supposed to be signing the forms regarding the release of Juul's products.

187.     However, in February or March of 2018, Mrs. Briggs noted that Ms. Calero was releasing products with a form containing the previous QA employee's signature.

188.     When Mrs. Briggs objected to this practice, Ms. Calero berated Mrs. Briggs and continued to release the product under the previous QA manager's name and signature.

189.     After her repeated complaints and efforts to implement appropriate safety measures, Mrs. Briggs was told that AFG no longer wanted her onsite at the facility.

190.     Mr. McIver independently witnessed several mixed lots and contaminated product and attempted to share his concerns with the AFG QA team and Juul management.

191.     As with Mrs. Briggs, Mr. McIver's concerns were ignored and, like Mrs. Briggs, Mr. McIver was moved away from the facility and production areas.

192.     As noted above, Mrs. Briggs was thereafter instructed to cease reporting to the plant or any other facility, and to work only from home.

193.     Mrs. Briggs was not permitted to return to that supplier plant and/or offsite office. As Mr. McIver still went to the facility, he reported to Mrs. Briggs his troubling observations that the mixed lots, blood incidents, mislabeled products and

contamination were still occurring on a daily basis and that no one sought to control the risk.

194.   Mr. McIver further stated that he witnessed non-conforming product not being quarantined, but instead shipped out for production and distribution.

195.   He further noted that SCARs and customer complaints were not being properly addressed.

196.   Juul treated Mrs. Briggs in a hostile and harassing manner for bringing up these legitimate concerns.

197.   In or about May 2018, Mrs. Briggs suffered a concussion and traumatic brain injury.

198.   Mrs. Briggs was granted leave under the Family and Medical Leave Act ("FMLA"), and took one week off of work to deal with the injuries suffered and her PTSD from the extreme incident of racial harassment she had been subjected to the previous month.

199.   After taking off one week, Mrs. Briggs continued to work from home during her recovery.

200.   Mrs. Briggs was eventually cleared by her treating physician to return to work, without restrictions, and she returned to the office on or about January 7, 2019.

201.   Upon her return, Mrs. Briggs was not permitted to return to the line.

202.   When she attempted to go to the plant, Damien Reverte asked Mrs. Briggs what she was doing there.

203.   Mrs. Briggs responded that she was back to work and back on-site at the plant.

204.     In response, Mr. Reverte stated that she was not to be back on site, as the plant did not want her there anymore and Juul had placed Mrs. Briggs in another department with a different job.

205.     Mr. Reverte further noted that Juul was going to shut down the plant due to testing violations, which Mrs. Briggs had previously observed and reported.

206.     Thereafter, Juul laid off several employees at the site, including Mr. McIver.

207.     Later that day, Mrs. Briggs received an email to meet with her supervisor Ameya Phalke (previously her co-worker) at one o'clock.

208.     Mr. Phalke informed Mrs. Briggs that she was going to be a manager, that the position did not require travel, and was a good fit because of Mrs. Briggs' excellent relationships established with suppliers.  Her support writing quality agreements and managing supplier audits with Ms. Caraballo's team and another Juul manager supporting the Asia market was also beneficial.

209.     Mrs. Briggs was instructed to start building a permanent team for the supplier's quality audit program, to manage supplier quality agreements, audits, review and approve final audit reports and backlogs, and to help bring suppliers in compliance with industry regulations standards with Ms. Caraballo.  Her immediate assignment was to write job descriptions for the supplier quality auditors that she was seeking to hire to support the supplier audit program. Mrs. Briggs never heard or received formal documents from JUUL HR which outlined new job change or duties.

210.     Mrs. Briggs was told that she did not need to report to the work site, but should only work from home.

211.     She was also informed that she was going to report to Mr. Phalke, Director of Supplier Quality, who had previously been her co-worker.

212.     In this new role, Mrs. Briggs performed at a high level and remained committed to ensuring the safety of Juul's products.

213.     When Mrs. Briggs asked Mr. Phalke why her role had changed, Mr. Phalke indicated that it was due to a lack of work and opportunities for Mrs. Briggs with North Carolina and surrounding area suppliers.

214.     Mrs. Briggs learned that a Juul Senior Quality Engineer with much less industry experience took over a number of her previous duties supporting North Carolina suppliers and suppliers in the surrounding area.

215.     She also learned that Juul continued to obtain additional business with multiple North Carolina suppliers that were serviced by other Juul Senior Quality Engineers.

216.     Despite Mrs. Briggs' acceptance of her new responsibilities and objectively excellent performance in the new role, Juul continued its pattern of discrimination, harassment and retaliation against Mrs. Briggs.

217.     Among other things, upon Mrs. Briggs' return from FMLA leave relating to her disabilities, Juul engaged in the following instances of harassment, discrimination and retaliation:

   a.   Mrs. Briggs was questioned about her work product, including timeliness and output.  As a result, she emailed Mr. Phalke to request the job responsibilities and accountability of her new position. She did not receive a response.

   b.   In May 2019, Mr. Phalke informed Mrs. Briggs that she had to engage in significant travel, including flying, for her position. Mrs. Briggs reminded him that she was diagnosed with PTSD in connection with the discrimination and harassment she had experienced while working, and would have to check with her doctor regarding flying. In response, Mr. Phalke told her that "he did not want to hear it" and that she was required to fly.

   c.   In August 2019, Mrs. Briggs had a performance review and received unjustified, extremely low ratings. Mrs. Briggs contacted Joanna Engelke,

Chief Quality Officer, to question the low ratings, noting that no one had ever informed Mrs. Briggs that her performance was lacking and she had never received any written warning or documentation regarding poor performance.

d.  All the Juul employees received large bonus checks except for Mrs. Briggs. Again, Mrs. Briggs contacted Juul to question the discriminatory treatment. Marcus Gesner, Vice President of QA for Juul told her that she "wasn't worth her pay."

e.  Mrs. Briggs was not provided with the same Company incentives and perks as her White colleagues.

f.  During this period of continued harassment and discrimination, Mrs. Briggs was abruptly informed by several employees, including AFG employees Chris Jones and Rob Morehead, Juul employees Mark Hall, Sam Kim and Josephine McElroy, and consultant Alina Caraballo, that other employees were specifically hired and allocated to support her termination. Several of these exchanges were witness by Charles McIver.

g.  Mrs. Briggs learned that other members of her team and/or her colleagues were told not to speak with or engage with her. For example, Mrs. Briggs had previously worked closely with Alina Caraballo's consulting company, but they were instructed not to speak with her.  Thus, while others were able to work as a team and utilize help and assistance from others, Mrs. Briggs was left on her own without any assistance from anyone at Juul.

218.    Notwithstanding the foregoing, Mrs. Briggs continued to perform at a high level.

219.    Again, Mrs. Briggs reported the discriminatory and retaliatory acts to Ms. Engelke, expressing her belief that these latest discriminatory and harassing acts were also retaliatory.

220.    Due to the severity and nature of the discrimination, harassment and retaliation against Mrs. Briggs, Ms. Engelke told Mrs. Briggs that they should contact Human Resources.

221.     Mrs. Briggs did so, and a meeting was scheduled.

222.     At the meeting with Human Resources, Mrs. Briggs reiterated her concerns about discrimination, harassment and retaliation and complained that the recent events were acts of retaliation because she was not permitted to go back on site.

223.     Mrs. Briggs noted that she was purportedly given a manager position, but was not given any documentation about her position, and was not performing the work originally set forth in her job description as Senior Quality Engineer.

224.     Mrs. Briggs also stated that she was being put in various unrelated places and was not given any support or structure for a career at Juul.

225.     In response, Mr. Gesner again told Mrs. Briggs that her skills did not warrant her pay and stated that her job description had changed.

226.     Mrs. Briggs, however, had never received any copy or notification of any change in her job description, despite her requests for such information.

227.     Mr. Gesner questioned whether she wanted the job, and indicated that if she did, she would be required to fly to New York and other supplier sites.

228.     Concerned about losing her job, Mrs. Briggs immediately accepted the change and contacted her physician for a note.

229.     Mrs. Briggs' physician could not recommend that she travel to New York, so instead, Mrs. Briggs took completed mandatory training at home.

230.     Thereafter, Juul insisted that Mrs. Briggs fly, despite her doctor's recommendations.

231.     Out of loyalty and dedication to Juul and her job, Mrs. Briggs defied her doctor's orders and agreed to fly for Juul.

232.     However, Juul continued its pattern of discriminating against, harassing and retaliating against Mrs. Briggs.

233.     Notably, Mrs. Briggs noticed that other White employees had at least two people traveling with them for initial audits, but that she was scheduled to travel and conduct an initial audit alone.

234.     Juul also subjected Mrs. Briggs to other less favorable conditions than her White counterparts with respect to travel.

235.     When Mrs. Briggs objected to the differential and discriminatory treatment, she was rudely told that she would not have any assistance.

236.     Mrs. Briggs also complained about this act of discrimination and harassment.

237.     Mrs. Briggs learned that Sarah Oberholtzer, a White female employee who had been employed for less than one year, was earning over $100,000, even though it was her first job and she had no experience.

238.     Notably, contrary to what had been told to Mrs. Briggs regarding her salary, no one ever told Ms. Oberholtzer, at any point, that she was making too much money or that she was not worth her pay.

239.     Mrs. Briggs assisted Ms. Oberholtzer in every way she could and responded helpfully to all Ms. Oberholtzer's requests.

240.     In October 2019, even though Mrs. Briggs was still required to travel, Juul informed Ms. Oberholtzer that she could travel if desired, but that she was no longer required to travel for her position.

241.     This news was highly upsetting and disturbing to Mrs. Briggs, particularly given that Juul had informed her that she was required to travel against her doctor's orders or risk losing her job.

242.     Nevertheless, Mrs. Briggs continued to diligently perform her duties in a
professional manner.

243.     In early November, Juul abruptly instructed Mrs. Briggs to cancel her
remaining travel, even though certain trips had already been booked.

244.     Mrs. Briggs was directed to attend a meeting on November 13, 2019.

245.     On the morning of November 13, 2019, Juul instructed Mrs. Briggs to bring
her laptop, phone and records to the meeting.

246.     At the meeting, Mrs. Briggs was informed that she was going to be placed on
administrative leave and then terminated in January.

247.     Mrs. Briggs was told that the organization was restructuring and "cutting some
fat."

248.     Mrs. Briggs was shocked to hear this, as she had been in the department for
longer than many other employees, had been awarded significant stock, and had been
overwhelmingly successful in her position.

249.     At the time Mrs. Briggs was terminated, she was forty-nine (49) years old.

250.     Mrs. Briggs understands that at the time she was terminated, all other
employees at Juul with her same job title that were retained in the group Mrs. Briggs
reported to and engaged with on a daily basis were under forty (40) years old and not
African American.

251.     Mrs. Briggs also overheard a number of other employees, including Senior
Manager, Supply Quality, Mehul Patel, comment that Juul was the "young, new
vibrant, Google and Amazon."

252.     Following her termination, Juul inappropriately attempted to coerce Mrs.
Briggs into signing a severance package.

31

253.     Despite these efforts to coerce Mrs. Briggs into signing a severance package, Juul has refused to pay Mrs. Briggs an appropriate severance and has caused severe financial damage to Mrs. Briggs by, among other things, depriving her of substantial bonuses and forfeiting a significant portion of her stock.

254.     By contrast, Mrs. Briggs is aware that White employees who were terminated under similar circumstances were provided with packages that included vesting of their outstanding stock, resulting in significant six and seven-figure financial gains for the similarly situated White employees.

255.     Due to the discrimination, harassment and retaliation she experienced, including her abrupt termination and the particularly egregious incident where she was held by armed guards, Mrs. Briggs has suffered severe emotional and psychological distress and has been compelled to see a physician for her mental health.

256.     She continues to be treated with medication and ongoing therapy.

257.     The above-described facts demonstrate that Mrs. Briggs was discriminated against and harassed on the basis of her race, age, disability and/or perceived disability, and retaliated against for her complaints regarding discrimination and harassment.

258.     The above-described facts demonstrate that Mrs. Briggs was retaliated against for taking or seeking to take FMLA leave and retaliated against for complaining about and refusing to engage in illegal acts at Juul.

259.     The above-described facts demonstrate that the reason provided for Juul's termination of Mrs. Briggs is mere pretext for discrimination and retaliation.

260.     Despite her loyalty, dedication and consistent performance, Defendant discriminated against and harassed Mrs. Briggs because of her race, sex and disability

or perceived disability, and retaliated against Mrs. Briggs for her complaints and for her seeking FMLA leave, in violation of Title VII, the ADA, the ADEA, the FEHA, the FMLA, Section 1981 and the California Whistleblower Law.

261.    In terminating Mrs. Briggs prior to the vesting dates for her equity awarded to her pursuant to the Equity Incentive Plan and her employment agreement, among other actions, Defendant breached its fiduciary duties to Mrs. Briggs as a plan participant and interfered with her ERISA rights, in violation of ERISA.

262.    By wrongfully terminating Mrs. Briggs prior to the anticipated payout of her full Altria bonus, prior to the vesting date for her equity awarded to her pursuant to the Equity Incentive Plan and employment agreement, and failing to pay the value of the promised equity, Altria bonus and annual bonus, Defendant breached the Employment Agreement and the Altria Award.

263.    By wrongfully terminating Mrs. Briggs prior to the anticipated payout of her full Altria bonus, and prior to the vesting date for her equity awarded to her pursuant to the Equity Incentive Plan and employment agreement, and failing to pay the value of the promised equity, Altria bonus and annual bonus, Defendant breached the duty of good faith and fair dealing implied in the Employment Agreement and Altria Award.

264.    In terminating Mrs. Briggs and causing the subsequent adverse effects with respect to her equity, Defendant has breached its promises to Mrs. Briggs and breached the duty of good faith and fair dealing with respect to those promises.

265.    By terminating Mrs. Briggs, Defendant also deprived her of her rights with respect to her vested equity in that, among other things, Mrs. Briggs' rights that she would have otherwise had had she not been terminated were lost.

266.     Mrs. Briggs has suffered and continues to suffer mental anguish and severe emotional distress as a direct and proximate result of the actions and inactions of Defendant.

267.     Defendant and its agents acted with the intent of causing or with reckless disregard for the probability that their actions would cause Mrs. Briggs severe emotional distress.

268.     Mrs. Briggs has suffered financial losses, which include, among other things, lost wages, and an obligation for attorneys' fees and costs of bringing suit, and the loss of the value of her stock as a direct and proximate result of the actions and inactions of Defendant.

**COUNT I**
**Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e), et seq.**

269.     Plaintiff, Grace Briggs, repeats and realleges each and every allegation in the above paragraphs of this complaint with the same force and effect as if fully set forth herein.

270.     Based on the foregoing, Defendant engaged in unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000(e) et seq.

271.     In discriminating against and harassing Mrs. Briggs because of her race, and in retaliating against Mrs. Briggs for her complaints about discrimination and harassment, Defendant violated Title VII.

272.     Defendant's violations were intentional and willful.

273.     Defendant's violations warrant the imposition of punitive damages.

274.     As a direct result of the unlawful employment practices engaged in by Defendant, Plaintiff has sustained a loss of earnings, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay and interest due thereon.

275.     Plaintiff is suffering and will continue to suffer irreparable harm and monetary damages as a result of Defendant's actions unless and until this Court grants the relief requested herein.

<u>**COUNT II**</u>
**The Americans with Disabilities Act, 42 U.S.C. § 12101, <u>et seq.</u>**

276.     Plaintiff, Grace Briggs, repeats and realleges each and every allegation in the above paragraphs of this complaint with the same force and effect as if fully set forth herein.

277.     Based on the foregoing, Defendant engaged in unlawful employment practices in violation of the Americans with Disabilities Act.

278.     In discriminating against and harassing Mrs. Briggs on the basis of her disability and/or because Defendant regarded Mrs. Briggs as disabled, and in retaliating against Mrs. Briggs for complaining about discrimination and harassment, Defendant violated the ADA.

279.     Said violations were intentional and willful.

280.     Said violations warrant the imposition of punitive damages.

281.     As the direct and proximate result of Defendant's violation of the Americans with Disabilities Act, Plaintiff has sustained loss of earnings, severe emotional and psychological distress, loss of self-esteem, loss of reputation and opportunity for

career advancement, loss of future earning power, as well as back pay, front pay, and interest due thereon, and has incurred an obligation for attorneys' fees and costs.

282.     Plaintiff is suffering and will continue to suffer irreparable harm and monetary damages as a result of Defendant's actions unless and until this Court grants the relief requested herein.

<u>**COUNT III**</u>
**Age Discrimination in Employment Act, 29 U.S.C. § 621, <u>et seq</u>.**

283.     Plaintiff, Grace Briggs, repeats and realleges each and every allegation in the above paragraphs of this complaint with the same force and effect as if fully set forth herein.

284.     Based on the foregoing, Defendant engaged in unlawful employment practices in violation of the ADEA.

285.     Plaintiff is and was at the time she was notified of her termination, over forty years of age, and an individual within the class protected by the ADEA.

286.     In discriminating against and harassing Mrs. Briggs because of her age, and in retaliating against Mrs. Briggs for her complaints of discrimination and harassment, Defendant violated the ADEA.

287.     Defendant's violations were intentional and willful.

288.     Defendant's willful violations of the ADEA warrant an award of liquidated damages.

289.     As the direct result of the aforesaid unlawful employment practices engaged in by Defendant, Plaintiff has sustained a loss of earnings, loss of severance, retirement and other benefits, loss of incentive and bonus payments, severe emotional and psychological distress, loss of self-esteem, loss of reputation and opportunity for

career advancement, loss of future earning power, as well as back pay, front pay and interest due thereon, and has incurred attorneys' fees and costs.

290.    Plaintiff is suffering and will continue to suffer irreparable harm and monetary damages as a result of Defendant's actions unless and until this Court grants the relief requested herein.

## COUNT IV
### FEHA

291.    Plaintiff, Grace Briggs, repeats and realleges each and every allegation in the above paragraphs of this complaint with the same force and effect as if fully set forth herein.

292.    Based on the foregoing, Defendant engaged in unlawful employment practices in violation of the the FEHA.

293.    In discriminating against and harassing Mrs. Briggs because of her race, disability or perceived disability and age, and in retaliating against Mrs. Briggs for her complaints of discrimination and harassment, Defendant violated the FEHA.

294.    Defendant's conduct violates the FEHA, and as a direct, foreseeable, and proximate result of Defendants' willful, knowing, and intentional violation(s) of the FEHA, Plaintiff has sustained and continues to sustain substantial losses in earnings and other employment benefits, including harm to her future employability.

295.    As a direct, foreseeable, and proximate result of Defendant's conduct, including its willful, knowing, and intentional violation(s) of the FEHA, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to her damage in a sum according to proof.

296.     Defendant's conduct was carried on in violation of Civil Code § 3294 insofar as it was done with a willful and conscious disregard of Plaintiff's rights, was oppressive in that it was despicable conduct which subjected Plaintiff to cruel and unjust hardship in conscious disregard of her rights; accordingly, Defendant is liable in punitive damages for the conduct of its officers and managing agents.

297.     Plaintiff has incurred and continues to incur legal expenses and attorney fees to which Plaintiff is entitled under the FEHA. Plaintiff is presently unaware of the precise amount of these expenses and fees, and prays leave of court to amend this Complaint when the amounts are more fully known.

298.     The Defendant's acts were with malice and reckless disregard for plaintiff's protected civil rights.

299.     The Plaintiff, Grace Briggs, has and will continue to suffer irreparable injury and monetary damages as a result of the Defendant's discriminatory practices unless and until this Court grants relief.

## COUNT V
### The Civil Rights Act of 1866, 42 U.S.C. § 1981, et seq.

300.     Plaintiff, Grace Briggs, repeats and realleges each and every allegation in the above paragraphs of this complaint with the same force and effect as if fully set forth herein.

301.     Based on the foregoing, Defendant engaged in unlawful employment practices in violation of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("Section 1981").

302.     In discriminating against and harassing Mrs. Briggs on the basis of her race, and in retaliating against Mrs. Briggs for her complaints of discrimination and harassment, Defendant violated Section 1981.

303.     Said violations were intentional and willful.

304.     Said violations warrant the imposition of punitive damages.

305.     As a direct and proximate result of the unlawful employment practices engaged in by Defendant, Plaintiff Grace Briggs has sustained a loss of earnings, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay and interest due thereon.

306.     Plaintiff is suffering and will continue to suffer irreparable harm and monetary damages as a result of Defendant's actions unless and until this Court grants the relief requested herein.

## COUNT VI
### The Family and Medical Leave Act, 29 U.S.C. § 2611, et seq.

307.     Plaintiff, Grace Briggs, repeats and realleges each and every allegation in the above paragraphs of this complaint with the same force and effect as if fully set forth herein.

308.     Defendant's conduct, in retaliating against Mrs. Briggs for taking and/or attempting to take leave pursuant to the Family and Medical Leave Act, violated the FMLA.

309.     Defendant's violations of the FMLA were intentional and willful, as Defendant knew or should have known the requirements of the FMLA, but disregarded those requirements.

310.     Defendant's violations of the FMLA warrant the imposition of liquidated damages.

311.     As a direct and proximate result of Defendant's violations of the FMLA, Mrs. Briggs has sustained a loss of earnings, severe emotional and psychological distress,

personal embarrassment, loss of self-esteem, loss of earning power, back-pay, front-pay, interest due thereon, and has incurred attorneys' fees and costs.

312.     Plaintiff is now suffering and will continue to suffer irreparable harm and monetary damages as a result of Defendant's actions unless and until this Court grants the relief requested herein.

## COUNT VII
### Whistleblower Under 1102.5

313.     Plaintiff, Grace Briggs, repeats and realleges each and every allegation in the above paragraphs of this complaint with the same force and effect as if fully set forth herein.

314.     Labor Code § 1102.5(b) makes it unlawful for an employer to retaliate against an employee because the employer believes that the employee has reported violations of state or federal statutes or local, state or federal rules, or regulations, to a government agency or to a person with authority over the employee.

315.     At various times during Plaintiff's employment, up to the time immediately before her termination, Plaintiff did report violations of federal and state statutes rules and regulations, including but not limited to: Defendant's violations of Title VII, the ADA, the ADEA, FEHA, Section 1981, CFRA and the FMLA to persons with authority over her.

316.     At the time of her reports, Plaintiff believed and had reasonable cause to believe that Defendants were violating those statutes, regulations and rules protecting her rights under Title VII, the ADA, the ADEA, FEHA, Section 1981, CFRA and the FMLA.

317.     Defendant subjected Plaintiff to retaliation, culminating in her termination; and, further, at the time Defendant terminated Plaintiff's employment, they perceived or knew that Plaintiff had made the above-described reports, and did in fact terminate Plaintiff because she made those reports.

318.     As a direct and proximate result of Defendant's wrongful termination, Plaintiff has sustained, and continues to sustain, loss of earnings, the full nature and extent of which are presently unknown to Plaintiff, and will be established at trial according to proof.

319.     As a further direct and proximate result of Defendant's wrongful termination of Plaintiff as heretofore described, Plaintiff has been damaged and deprived of the security, solace and peace of mind for which she entered the employment relationship with Defendant, thereby causing her to suffer emotional and mental distress, anguish, embarrassment and humiliation, all to her general damages in an amount according to proof at trial, but in excess of the jurisdictional amount of this court.

320.     Defendant's conduct was a substantial factor in causing Plaintiff's harm.

321.     Under the provisions of Labor Code § 1102.5(m) Defendant is liable for a civil penalty up to $10,000.00.

322.     Plaintiff has incurred and continues to incur legal expenses and attorney fees to which she is entitled under Title VII, the ADA, the ADEA, FEHA, Section 1981 and the FMLA.

## COUNT VIII
### Employee Retirement Income Security Act of 1974
### Breach of Fiduciary Duties

323.     Plaintiff, Grace Briggs, repeats and realleges each and every allegation in the

above paragraphs of this complaint with the same force and effect as if fully set forth

herein.

324.     Mrs. Briggs was a participant or beneficiary in an employee benefit plan, the

Equity Incentive Plan.

325.     Defendant breached its fiduciary duties to Mrs. Briggs by, among other things,

wrongfully terminating her in violation of state and federal law, in order to wrongfully

deprive Mrs. Briggs of benefits under the Plan.

326.     Mrs. Briggs has exhausted any available administrative remedies for her claims

or is excused from doing so.

327.     Defendant, a plan fiduciary, misled and was purposefully dishonest in its

dealings with Mrs. Briggs, a plan participant, in an effort to save Juul money.

328.     Juul, a plan fiduciary, failed to discharge its duties with respect to the Plan

solely in the interest of Mrs. Briggs, a plan participant, and instead acted in their own

interest in taking the actions described herein in breach of its fiduciary duties to Mrs.

Briggs.

329.     Mrs. Briggs suffered damages as a result of Defendant's actions as outlined

herein.

330.     Accordingly, Mrs. Briggs is entitled to appropriate equitable relief, under

ERISA §502 (a)(3) and/or additional benefits under ERISA §502 (a)(1)(B).

## COUNT IX
**Employee Retirement Income Security Act of 1974**
**Interference, Section 510**

331.     Plaintiff, Grace Briggs, repeats and realleges each and every allegation in the above paragraphs of this complaint with the same force and effect as if fully set forth herein.

332.     Mrs. Briggs was a participant or beneficiary in an employee benefit plan, the Equity Incentive Plan, as the term "participant" is defined in ERISA Section 3(7), 29 U.S.C. §1002(7).

333.     Mrs. Briggs has exhausted any available administrative remedies for her claims or is excused from doing so.

334.     In terminating Mrs. Briggs as a result of discrimination, harassment and retaliation, knowing and intending that her termination would cause her to be deprived of benefits pursuant to the Equity Incentive Plan, Defendant interfered with Mrs. Briggs's ERISA rights under the Equity Incentive Plan, in violation of ERISA, Section 510.

335.     As the direct and proximate result of Defendant's violations of ERISA, Plaintiff has sustained a loss of benefits and interest due thereon, and has incurred attorneys' fees and costs.

## COUNT X
**Breach of Contract**

336.     Plaintiff, Grace Briggs, repeats and realleges each and every allegation in the above paragraphs of this complaint with the same force and effect as if fully set forth herein.

337.     The parties agreed on the terms and conditions of Mrs. Briggs' employment, including an annual bonus and equity to be awarded to Mrs. Briggs.

338.     The parties further agreed to an additional equity award to Mrs. Briggs and an additional bonus - the Altria Award.

339.     Despite the contractual commitments made to Mrs. Briggs, Defendant breached the Employment Agreement and Altria Award by wrongfully terminating Mrs. Briggs prior to the vesting date for her equity and prior to payment of the full Altria Award.

340.     Defendant further breached the Employment Agreement by failing to pay Mrs. Briggs for her 2019 annual bonus and/or a prorated bonus for 2020, despite Mrs. Briggs working and being employed for the entirety of 2019 and part of 2020.

341.     All conditions precedent, if any, necessary to bring Mrs. Briggs' action against Defendant have been satisfied.

342.     As a direct, foreseeable, natural, ordinary and proximate result of Defendant's breaches and other bad faith conduct, Plaintiff has suffered significant financial and other damages, interest due thereon, and has incurred attorney's fees and costs.

<u>**COUNT XI**</u>
**Breach of Duty of Good Faith and Fair Dealing**

343.     Plaintiff, Grace Briggs, repeats and realleges each and every allegation in the above paragraphs of this complaint with the same force and effect as if fully set forth herein.

344.     The parties agreed on the terms and conditions of Mrs. Briggs' employment, including an annual bonus and equity to be awarded to Mrs. Briggs.

345.     The parties further agreed to an additional equity award to Mrs. Briggs and an additional bonus - the Altria Award.

346.    Despite the contractual commitments made to Mrs. Briggs, Defendant breached the duty of good faith and fair dealing implied in the Employment Agreement and Altria Award by wrongfully terminating Mrs. Briggs prior to the vesting date for her equity and prior to payment of the full Altria Award.

347.    Defendant further breached the duty of good faith and fair dealing implied in the Employment Agreement by failing to pay Mrs. Briggs for her 2019 annual bonus and/or a prorated bonus for 2020, despite Mrs. Briggs working and being employed for the entirety of 2019 and part of 2020.

348.    Defendant's acts were in bad faith, for the purpose of attempting to avoid paying Mrs. Briggs the amounts and equity owing to her.

349.    By using its authority in bad faith for the purpose of frustrating Mrs. Briggs' expectations, Defendant breached the covenant of good faith and fair dealing.

350.    As a direct, foreseeable, natural, ordinary and proximate result of Defendant's breaches and other bad faith conduct, Plaintiff has suffered significant financial and other damages including, but not limited to, loss of earnings, loss of the equity and bonuses promised, and interest due thereon.

### COUNT XII
**Unjust Enrichment**

351.    Plaintiff, Grace Briggs, repeats and realleges each and every allegation in the above paragraphs of this complaint with the same force and effect as if fully set forth herein.

352.    Count XII is brought in the alternative to Counts X and XI.

353.    Mrs. Briggs conferred benefits upon Defendant.

354.    Defendant appreciated the benefits conferred by Mrs. Briggs.

355.     Based on the promises and representations made by Defendant, Mrs. Briggs was led to believe and understood that she would be compensated with the equity and bonuses promised to her.

356.     Defendant failed to pay Mrs. Briggs the bonuses due to her, and wrongfully terminated her prior to the vesting date for her equity and payout of the Altria bonus.

357.     Defendant accepted the benefits provided by Mrs. Briggs under circumstances that would make it inequitable for Defendant to retain such benefits without corresponding and appropriate payment of value to Mrs. Briggs.

358.     For the reasons set forth above, Defendant is liable to Mrs. Briggs under a theory of unjust enrichment.

359.     As a direct, foreseeable, natural, ordinary and proximate result of Defendant's breaches and other bad faith conduct, Plaintiff has suffered significant financial and other damages, interest due thereon, and has incurred attorney's fees and costs.

## COUNT XIII
### Promissory Estoppel/Detrimental Reliance

360.     Plaintiff, Grace Briggs, repeats and realleges each and every allegation in the above paragraphs of this complaint with the same force and effect as if fully set forth herein.

361.     Count XIII is brought in the alternative to Counts X and XI.

362.     Based on the promises and representations made by Defendant, Mrs. Briggs was led to believe and understood that she would be compensated with the equity and bonuses promised to her.

363.     Mrs. Briggs reasonably relied upon these promises to her detriment.

364.     Defendant did not honor these promises.

46

365.     For the reasons set forth above, Defendant is liable to Mrs. Briggs under a theory of Promissory Estoppel or Detrimental Reliance.

366.     As a direct, foreseeable, natural, ordinary and proximate result of Defendant's breaches and other bad faith conduct, Plaintiff has suffered significant financial and other damages, interest due thereon, and has incurred attorney's fees and costs.

## COUNT XIV
### California Labor Code § 204

367.     Plaintiff, Grace Briggs, repeats and realleges each and every allegation in the above paragraphs of this complaint with the same force and effect as if fully set forth herein.

368.     Defendant violated the California Labor Code § 204 ("CLC") by refusing to pay all monies due and owing to Mrs. Briggs and thus failing to pay Mrs. Briggs her wages within the time specified by law.

369.     Defendant willfully failed to pay Mrs. Briggs her wages as defined by the CLC earned during the course of his employment within the time limits prescribed by the CLC.

370.     Defendant failed to pay Mrs. Briggs her earned wages more than 10 calendar days after the last day of the payroll period, in violation of CLC § 204.

371.     As a direct, foreseeable, natural, ordinary and proximate result of Defendant's breaches and other bad faith conduct, Plaintiff has suffered significant financial and other damages, interest due thereon, and has incurred attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

a.     Enter a judgment declaring that the acts and practices of the Defendant are in violation of the laws of California and the United States;

b.      To order the Defendant to reinstate Plaintiff to her position she held prior to her discriminatory and retaliatory discharge pursuant to Title VII, the ADA, the ADEA, Section 1981, the FMLA, and the FEHA;

c.      To award Plaintiff all of her pay and benefits absent the unlawful discrimination and retaliation; to award compensatory and punitive damages under all applicable laws to make Plaintiff whole and based upon Defendant's conduct that was malicious or undertaken with reckless disregard for her civil rights;

d.      To award the Plaintiff such other and further relief including equitable and injunctive relief as this Court deems just and proper including back pay, reinstatement, front pay, and to permanently enjoin the Defendant and its officers, successors and assigns and all persons in active concert or participation with them from engaging in any employment actions or practices that discriminate on the basis of race, age, disability or perceived disability;

e.      Order the Defendant to pay the costs and reasonable attorney's fees incurred by the Plaintiff;

f.      Order all relief available pursuant to Title VII, the ADA, the ADEA, the FMLA, the California FEHA, Section 1981, the Whistleblower Law, ERISA, the California Labor Code § 204, and common law; and

g.      Grant such other relief as the Court deems necessary and proper including reinstatement or front pay.

**JURY TRIAL DEMANDED.**

Respectfully submitted,

PAUL LAW OFFICES


        /s Gregory G. Paul
GREGORY G. PAUL
CA SBN: 233060
1808 Wedemeyer Street, Suite 216
San Francisco, CA 94129
Tel: (844)374-7200
Fax: (888) 822-9421
gregpaul@paullaw.com


BELL & BELL LLP

JENNIFER C. BELL
CHRISTOPHER A. MACEY, JR.
1617 John F. Kennedy Blvd., Suite 1254
Philadelphia, PA 19103
Tel: (215) 569-2500
Fax: (215) 569-2220
jenniferbell@bellandbelllaw.com
christophermacey@bellandbelllaw.com
*Pending admission pro hac vice*

*Attorneys for Plaintiff*

Dated:  November 12, 2021